[Civ. No. 19112. First Dist., Div. One. Mar. 14, 1960.]

SHARON SANCHEZ, Appellant, v. ARTHUR SANCHEZ, Respondent.

Lew M. Warden, Jr., for Appellant.

Walter H. Medak for Respondent.

TOBRINER, J.—We have issued a writ of supersedeas in this case to stay an order of the superior court directing the transfer of custody of two young minor children from their mother to their father. We have concluded that refusal

to issue the writ would adversely affect the welfare of the children. We can countenance neither the interruption in the children's schooling nor the disruption in their present lives by their removal to the father for the interim between the original order and the final decision on appeal. These untoward effects may be avoided by postponement of the removal, if such removal is upheld upon appeal, until the decision upon the appeal, which in the normal course of events should be rendered not later than the expiration of the present school term. As we shall point out, we believe these conclusions accord with the policy and provisions of the recently enacted section 949a of the Code of Civil Procedure.

Petitioner is the mother of three children by her marriage to respondent. Raymond, age 16, Sharon Margaret, age 12; and Joseph, age 8. Although the original order awarded custody of the two younger children to the mother and custody of the eldest to the father, the order in issue reverses this arrangement.

The legal proceedings began with a contested divorce action and an award on December 1, 1955, of custody pendente lite of the three children to the mother. Some four months thereafter, pursuant to a property settlement agreement, the court gave the custody of the two younger children, Sharon and Joseph to the mother, and the custody of Raymond to the father. Approximately three and one-half years later on October 22, 1959, the court made the order which produced the present issue, changing the custody of Sharon and Joseph from the mother to the father and of Raymond from the father to the mother. The mother immediately appealed. On November 18, 1959, the court denied, among other matters, the mother's motion for a stay of execution pending prosecution of the appeal and denied another motion for a stay pending determination by this court of the mother's petition for a writ of supersedeas.

The mother filed her petition for the writ on November 24, 1959, in this court, and on November 27, 1959, we stayed the orders of October 22, 1959, and November 18, 1959, pending our ruling upon the petition. After hearing the petition, this court, on January 28, 1960, granted it, staying the orders of October 22, 1959, and November 18, 1959, until such time as the decision on appeal were rendered and became final, or until further order of this court.

We have been asked to issue the writ to keep the two younger children with the mother pending the disposal of her appeal

from the court's award of their custody to the father. We must therefore examine the relevant Code of Civil Procedure, section 949a,[1] enacted in 1955, to determine, first, to what extent we are controlled by the action of the trial court in this matter and, second, what nature of test we employ to fix interim custody. We must set the test to the facts of this case, and before we issue a writ, beyond the fulfillment of these conditions, we must find that the trial court committed probable error in the award of custody, that is, in the order from which the mother appeals.

The section with which we deal, section 949a, obviously seeks the protection of the child from possible harm during the period between the order and the appeal, affording the trial court the power to act, if necessary, in that interval. Before the enactment of the section, the trial court could not order the transfer of the child from the appealing parent to the proper one, even though the child's retention by such appealing parent threatened imminent danger to the child. "In many cases there was serious need for an immediate change in the custody of a minor, but because of the above rule a change was delayed for substantial periods. To alleviate some of the problems in this area, the Legislature enacted section 949a of the Code of Civil Procedure." (29 So. Cal. L. Rev. (1955), pp. 113-114.) The Third Progress Report to the Legislature by the Senate Interim Judiciary Committee (March, 1955), upon which the legislation was based, alludes to the situation where "the welfare of the child demands a change."[2]

The Legislature's grant of dual jurisdiction to the trial court as well as to the appellate court, however, did not

---

[1] "An appeal does not stay proceedings as to those provisions of an order or judgment which award, change or otherwise affect the custody, including the right of visitation, of a minor child in any civil action . . .; provided, the trial court may in its discretion, stay execution of such provisions pending review on appeal or for such other period or periods as to it may appear appropriate. . . . The appellate court shall have the power to issue a writ of supersedeas, injunction, or other appropriate writ or order in such proceedings as may be proper in aid of its jurisdiction."

[2] "[I]f there is a modification of a custody order previously entered, the very reason for the modification in nearly every case will be that the trial judge has determined that the welfare of the child demands a change. Yet the mere perfecting of an appeal by the losing party will delay execution of the order, sometimes for very substantial periods. As a result the child is subjected to a continuance of the same conditions which brought about the change ordered. The rule is conducive to appeals for considerations other than those relating strictly to the merits of the appeal." (P. 34.)

reduce the role of the appellate court. The language of the legislation specifically preserves, rather than destroys, the historic power of the appellate court to issue the writ. As stated in *Saltonstall* v. *Saltonstall* (1957), 148 Cal.App.2d 109 [306 P.2d 492], "Suffice it to say that the changes in the law in 1955 expressly recognized the appellate courts' power to issue an appropriate writ or order, and in any event the court would have the power, even in the absence of any express recognition." (Pp. 115-116.) The nature of the writ issuable by this court is therefore not changed by the legislation.

We do not in such instances of dual jurisdiction of courts of first impression and courts of review nullify the function of the court which sees the witnesses and takes the testimony. If we were to exercise an original discretion in such a case, we would not only unduly restrict the trial court's province but invite applications that should initially be presented there. (*Crater* v. *Crater* (1902), 135 Cal. 633, 635 [67 P. 1049]; *Faulkner* v. *Faulkner* (1957), 148 Cal.App.2d 102 [306 P.2d 585]; *Saltonstall* v. *Saltonstall, supra* (1957), 148 Cal.App.2d 109.)

The welfare of the child nevertheless presents a more vital problem to this court than the disposition of money or property. Since normally no counsel represents the child as such and since he must therefore depend upon the presentation of either the father or the mother, we feel a direct obligation to protect his interests. As a consequence, in passing upon a writ of supersedeas involving child custody, pending determination upon appeal, we must scrutinize the record with the utmost care. The elements in such a case differentiate it from an application for the writ in a case which involves less crucial issues. Arbitrary action or abuse of discretion of the trial court in the interim custody case are weighed in a more delicate and sensitive scale.

Recognizing, then, the nature of our obligation, we must next define the test by which it is discharged. The trial court expressed the criterion in these words: "[I]t appears from the record that the welfare of either Sharon or Joseph would not be *adversely affected* by ordering compliance with the previous order of the court." (Italics added.) But the question is not the narrow one of whether the order can be effectuated without harm to the child: it is whether the *best interests* of the child will be attained by the immediate change or by continuation of the custody. Carefully weighing the

particular facts of the case, and taking into consideration the probability of error in the appealed decision, we must decide whether *the continuation of the existing custody is in the best interests of the child.*

We believe that this test accords with that expressed in the decisions, including those rendered prior to the adoption of Code of Civil Procedure, section 949a, when an appeal automatically stayed the transfer of custody and when the purpose of an application to the appellate court was to vacate that stay and permit the execution of the transfer. In passing upon such applications, the Supreme Court has looked primarily to the best interests of the child pending the determination of the appeal. Thus in the case of *In re Barr* (1952), 39 Cal.2d 25 [243 P.2d 787], in which the mother contended that her appeal stayed the ''modification order and that she [was] . . . therefore entitled to custody of the child pending appeal'' (p. 27), the court, through Justice Traynor, examined the situation to ascertain the ''best interests of the child . . . for the duration of the appeal'' (p. 28). The decision points out that cases undoubtedly would arise in which the best interests of the child would necessitate a removal from the parent having custody if that parent had been mistreating the child. In that case it would ''obviously be undesirable to leave the child with the appellant.'' (P. 28.) In the Barr proceeding, the court found no such situation and concluded that the child remain with the mother pending the ruling upon the appeal. The court concluded, ''There is no contention in the present case that the child may not safely remain with the mother pending the appeal.'' (P. 29.)

In *Gantner* v. *Gantner* (1952), 38 Cal.2d 691 [242 P.2d 329], which likewise involved the status of a child during an interim period, the court stated that in ''extraordinary circumstances'' the court would be required to take action as to the status of the child ''during the pendency of an appeal.'' (P. 692.) Since such extraordinary circumstances were not presented in that case the court continued the status quo, stating, ''Without a showing that serious evils threaten the welfare of the children, the status quo at the time the appeal was taken will not be disturbed.'' (P. 693.)

The legislation of 1955 enacting section 949a, Code of Civil Procedure, did not establish a different test. While the ''Third Progress Report of the Legislature by the Senate Interim Judiciary Committee'' (March, 1955) explains that

the perfection of an appeal could delay execution of an order for very substantial periods and that "[a]s a result the child is subjected to a continuance of the same conditions which brought about the change order" (quoted in *Faulkner* v. *Faulkner, supra* (1957), 148 Cal.App.2d 102, 106), it suggests only that continuation of a dangerous condition should be prevented; it does not state that the test as developed in prior cases should be obliterated.

Indeed, if this legislation did enact an automatic effectuation of an order changing custody despite appeal, it would compel the evil which the Legislature sought to correct. The evil, as described in the cases and as recognized in substance by the report, lies in the fact that too often the child's welfare becomes the deplorable battle ground upon which one warring parent attempts to wound and punish the other. As a result, through the use of the device of an appeal, the child, in the words of Justice White, dissenting, in *Saltonstall* v. *Saltonstall, supra* (1957), 148 Cal.App.2d 109, sometimes suffers a "judicial 'bouncing around' like a rubber ball" (p. 116) or in the language of *In re Barr, supra* (1952), 39 Cal.2d 25, quoting from *In re Browning* (1930), 108 Cal.App. 503, 507 [291 P. 650], is relegated to "the category of a human football" (p. 29). The section leaves intact the obligation of the court to ascertain the best interests of the child and accordingly determine whether the continuation of the status quo pending appeal exposes the child to serious evil or adverse effects.

 Applying these considerations to the instant problem, we cannot conclude that the status quo, when broken down into the dynamic factors of the situation, exposes the children to serious evil or adverse effects. We categorize the evidence as to each factor.

*Histories and qualifications of the parents.* Briefly reconstructed, the record of the mother discloses that she has been married three times since 1956; that she changed residence seven times in the preceding 19 months; that she drank alcoholic beverages to a considerable degree; that she exhibited neurotic behavior, such as taking overdoses of sleeping pills with suicidal intent; that she voluntarily committed herself to Agnew State Hospital; that she displayed an extremely strong interest in men and in social life, frequently leaving the children alone at night; and that her conduct manifested an overall general emotional instability. The court, however, did not find her to be an unfit mother.

The probation report, which was admitted into evidence, points out that since the mother's marriage to her present husband, Donald Plummer, in June, 1959, "she has taken good care of the two younger children as well as Raymond, who came to her home of . . . [his] own accord from the home of the defendant. . . ." While Mr. Plummer "has provided the youngsters with a nice home in a pleasant area of Hayward, California . . . [i]t is difficult to predict the stability of this home and [of] the plaintiff's marriage to Plummer. . . ."

At the conclusion of the hearing of October 22, 1959, the court, in describing the neurotic prior behavior of the mother, alludes to her "recent marriage" to Mr. Plummer, stating, "There is some indication that possibly at this late point Mrs. Plummer has stabilized herself," although the court explains that this has not been proved to its satisfaction in consideration of the welfare of the children. At the hearing on the writ when we asked the parties if the mother's marital situation had deteriorated since October 22, 1959, the father did not so contend. There is at least the hope that the mother may, under the circumstances of her present marriage, conduct herself with the self-discipline which she must, as a mother, give to her children. In this event the normal emotional relationship of a mother with a boy of 8 and a girl of 12 may be preserved. (Civ. Code, § 138.) The fulfillment of this hope must ultimately lie with no one but the mother herself; we believe she should be accorded the opportunity at least for the interim period.

As to the father, the probation report, as borne out by the record, shows that he has been able to provide the children with a stable home, having the needs of the children as his foremost concern. It is true, however, that during the period that Raymond, the 16-year-old boy, resided with his father, the boy failed to meet the scholastic requirements of the Catholic high school which he attended; that he was dismissed and transferred to a public school, and that in May of 1959 he ran away from the father's home. Raymond testified that his father "would yell at him" and call him opprobrious names; the father denied that he did so.

*Schooling.* It is obviously not advantageous to change the children's schools in the midyear. The detriment here becomes deeper because both Sharon and Joseph apparently have exhibited improvement in their present schools. The record shows that Joseph's teacher wrote the mother on November

16, 1959, that " [a]lthough Joseph is still below grade level in all school subjects, I would like to say that [with] your help at home [he] has shown a gradual improvement in his work." The principal of the school states, "Joseph . . . [s]ince the beginning of the term . . . has begun to show a steady improvement. Mrs. Plummer has conferred with teachers several times and assistance has been given at home."

As to Sharon, her English teacher states that her grades "are constantly improving because of a positive attitude and apparent effort on her part." Disruption by change of school under these circumstances does not inure to the advantage of the children. Moreover, the aid of the mother, which has evidently been salutary, would be foreclosed. While the father might attempt such help at home, the time available for a father to do so and the difficulty of consultation with teachers, because of his occupation, reduces his efficacy. Even a temporary dislocation in schooling, marring the children's present progress, should be avoided if possible.

*Home.* The temporary abode of the children at their present home will not expose them to any manifest danger. The award of the custody of Raymond to the mother establishes the court's apparent conclusion that the home is satisfactory for the teenage boy; the ruling is incompatible with the possibility that the home temporarily would entail serious evils for the younger children. Indeed the father testified that, although he had not seen the children since the order of October 22, they had to his knowledge been well cared for by the mother.

*Social relations.* The record shows, too, that Sharon desired to stay with the mother and when asked for her reasons answered, "I am already in school. I have my friends, and everything." Just as such temporary disruption of the social life of the child would be undesirable, so, too, would the destruction of the sibling relationship. Again, Sharon testified that she "would like to live with both [her brothers]," and that, as to Raymond, "We do a lot together . . . [w]e play games and stuff." The dissolution of these desirable relationships pending appeal is highly questionable.

*Intervention of this court.* On November 27, 1959 we stayed the superior court's orders of October 22, 1959, and November 18, 1959, pending our hearing, set for January 26, 1960. Having preserved the status quo for that period, we do not believe that it should be altered as of this interim date prior to the resolution of the appeal. The court is loath to compound the too frequent changes in the residence of the chil-

dren that have already occurred; unless we so continue the status quo, we expose the children to the possibility of even further undesirable and possibly reversible dislocations.

These are the factors which lead us to the conclusion that temporary custody of the children with the mother should continue. In the light of these factors we cannot hold that the appeal from the order is plainly without merit or presents no substantial questions. (3 Witkin, California Procedure, p. 2216; *People* v. *Jackson* (1923), 190 Cal. 257, 263 [212 P. 4]; *Private Investors* v. *Homestake Min. Co.* (1936), 11 Cal. App.2d 488 [54 P.2d 535].) Nor, applying the test of *Nuckolls* v. *Bank of California Nat. Assn.* (1936), 7 Cal.2d 574, 578 [61 P.2d 927], as approved in *Faulkner* v. *Faulkner, supra* (1957), 148 Cal.App.2d 102, 108, we cannot say that ''probable error has not been made to appear.'' The possibility remains that by appeal the order of the change of custody may be reversed.

While we appreciate the conscientious care with which the trial judge examined the case, we must point out that his conclusion as to the continued temporary custody of the mother cannot stand. Any holding that *interim* custody of the younger children would endanger their welfare is incompatible with the ruling that the mother should have *permanent* custody of the elder boy. If the court awarded such permanent custody to the mother, it could hardly find that temporary custody of the younger children, who presumptively belong with the mother in any event, could in some manner prove harmful. The court did not, of course, find the mother unfit. We are constrained to hold that this inconsistency, in addition to other factors we have discussed above, renders arbitrary the refusal of the stay. We conclude that the mother's continued custody of the children during the pendency of appeal does not injure, endanger or adversely affect them but is to their best interest. We have therefore granted the writ of supersedeas.

Bray, P. J., and Duniway, J., concurred.